**ASHLEY MEADOWS FARM, INC., Plaintiff,**

v.

**AMERICAN HORSE SHOWS ASSOCIATION, INC., Defendant.**

**No. 82 Civ. 5691 (RWS).**

United States District Court, S.D. New York.

Sept. 30, 1985.

Butler, Fitzgerald & Potter, P.C., New York City (James M. Davis and James H. Neale, New York City, of counsel), for plaintiff.

LeBoeuf, Lamb, Leiby & MacRae and Tenzer, Greenblatt, Fallon & Kaplan, New York City (H. Richard Wachtel, Molly S. Boast, Richard G. Reid and Thomas More Griffin, New York City, of counsel), for defendant.

SWEET, District Judge.

Defendant American Horse Shows Association, Inc. (the "Association") has made its third motion to dismiss this antitrust action brought by Ashley Meadows Farm, Inc. (the "Farm"), this time for summary judgment under Fed.R.Civ.P. 56. Upon the findings and conclusions set forth below, the motion will be granted on the grounds that the Farm lacks standing.

## The Parties

The Association was organized under the laws of New York in 1917 and has become the national equestrian federation of the United States. Its membership is comprised of approximately 2,000 recognized horse shows and more than 40,000 individual members. The Association does not operate horse shows. From time to time the Association prints its Constitution and Rules which govern recognized horse show competitions.

The Farm is a corporation organized in 1979 which has owned and operated a number of horse shows recognized by the Association every year since 1980. The Farm, whose president and operator is Dolores A. Swann ("Mrs. Swann"), has operated its shows at a facility in Berwyn, Pennsylvania.

## Prior Proceedings

According to the Association, "this litigation has wandered without clear direction for nearly three years." This perigrination is worth recording, representing as it does a classic example of the difficulties presented in achieving an efficient disposition of litigation. Energetic and ingenious counsel, both present and past, have overlooked no opportunity to employ their skills, and the disposition of the action has been delayed by discovery disputes and motion practice despite the resolution by the court of each issue raised by the parties. Positions of the parties have shifted and the issues sensitive to each of the parties have been thoroughly explored. The process has been exhaustive, presumably expensive and has been guided, as it must be, by the litigative strategies of the parties, including the Association's instant motion for summary judgment on the eve of trial after all discovery has been completed.

The initial complaint was filed on August 27, 1982, alleging prima facie tort committed by the Association and its secretary, Ira Finkelstein, against the Farm and its president Mrs. Swann. The complaint arose out of the Farm's claim regarding the alleged denial of certain procedural rights in connection with the Association's imposition of a $500 fine for the Farm's failure to provide ambulance service at one of its horse shows. Although the suit was scheduled for a pretrial conference on November 30, 1982, the court was advised a settlement had been reached and the action was dismissed on December 2, 1982, only to be reopened later at the request of the litigants.

In February, 1983, the Farm filed an amended complaint alleging the antitrust violations which have remained at issue to the present. In response, the Association and Ira Finklestein moved to dismiss the complaint for failure to state a claim upon which relief may be granted. By opinion of September 29, 1983, the motion was granted as to Finklestein and denied as to the Association. At the end of 1983, the Association requested and was granted a substitution of counsel. Shortly thereafter, the Farm requested an entry of judgment for failure to answer timely the amended complaint. The entry of default was eventually set aside upon the motion brought by the Association's new counsel.

On January 31, 1984, the parties requested additional time in order to complete motions and discovery and to pursue settlement. The request was granted and a deadline of June 11, 1984 was ordered, not to be extended except by motion. By May discovery disputes had arisen requiring a court conference for resolution. A trial date of July 2 was set. On June 19, 1984 the Association moved for summary judgment. After an adjournment by consent the motion was eventually granted as to Mrs. Swann and denied as to the Farm by the opinion dated September 20, 1984. In

denying summary judgment seeking dismissal of the Farm's complaint for lack of standing, the opinion stated:

> Given the availability to [the Farm] of its own financial statements and its asserted intention to introduce evidence of the profitability of horse shows of the category and scale which [the Farm] had desired to sponsor, the rigorous showing necessary to grant a summary judgment motion has not been satisfied.

A further order set November 28, 1984 as the deadline for completion of discovery and by December 9 a pretrial order had been submitted and modified. The Association responded by seeking to stay completion of discovery until February 2, 1985. The court was then advised that the action was settled, and later that it was not. On February 4, 1985, the Farm moved for summary judgment. The hearing on the Farm's motion was adjourned on consent and by opinion of May 10, 1985 it was denied. A deadline of July 16 was set for the completion of discovery and the submission of a pretrial order. The instant motion was filed on July 3, 1985 and heard by consent of the parties on July 26. Rather than wandering without direction, this action has been detoured by last minute diversions as set forth above, of which the instant motion is simply the latest and the most successful.

**The Issues**

The question of standing and the degree of injury necessary to confer it has already been considered by the court once before, prior to the completion of discovery and submission of a pretrial order clarifying the proof anticipated by both the Association and the Farm. Under the peculiar and particular circumstances here presented and described below, it is now apparent that the Farm will not present any evidence of monetary damages to it. The question of its standing to obtain injunctive relief is thus presented.

**The Availability of Summary Judgment and the Undisputed Facts**

Summary judgment at the hands of a trial judge is a difficult determination to make and equally difficult to support on appeal. The authorities are oft cited. On the one hand, a court considering a motion for summary judgment must resolve all doubts and draw all reasonable inferences in favor of the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *United States v. One Tintoretto Painting Entitled "The Holy Family with Saint Catherine and Honored Donor,"* 691 F.2d 603, 606 (2d Cir. 1982). Moreover, this Circuit has long had a policy in favor of allowing the development of a full factual record through trial of the issues presented, a policy which is limited by the grant of summary judgment. *See Jaroslawicz v. Seedman*, 528 F.2d 727, 731 (2d Cir.1975).

On the other hand, a plaintiffs' failure to allege substantial facts and its mere reliance on a general denial of the accuracy of the opponent's affidavits is insufficient to controvert a motion for summary judgment. *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983); *see WIXT Television, Inc. v. Meredith Corp.*, 506 F.Supp. 1003 (N.D.N.Y.1980). In such circumstances the use of summary judgment is desirable to avoid imposing and incurring "fruitless expenses of litigation." *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977). The court's prior opinions and its decision here have attempted to strike the delicate balance required by these principles.

Except as noted here, none of the facts previously found have been altered by the showing on this motion. The 212-page pretrial order reflecting the issues, the projected proof, and the stipulated facts has been considered in conjunction herewith and should be considered as an unattached appendix to this opinion. The pretrial order and the evidence submitted on this motion demonstrate the unique character of the facts now undisputed.

The initial prima facie tort claim was replaced by allegations of Sherman Act violations resulting from the Association's "Mileage Rule" which limits the time and

place of holding various categories of recognized horse shows. According to the Association, it is a governing board of equestrian sport under the legislation set up to organize the United States Olympic Committee. Once the United States Equestrian Team designates certain of the Association's shows as those upon which its selections are based, the Association's rules actually govern the competition. The Association maintains that its limitations on the holding of horse shows are necessary to further the sport of equestrian competition. It has already been held that a rule of reason analysis is applicable despite the *per se* violation resulting from these limitations on competition. Opinion of May 10, 1985.

Every year since 1980, the Farm has staged a number of horse shows recognized by the Association. The Farm expends funds to conduct its horse shows, and earns revenues on each show, primarily from the entry fees paid by exhibitors, who often travel across state lines to compete at Ashley Meadows Farm. Some of the Farm's shows have made a profit while others have not and the dates and ratings assigned to each of the Farm's horse shows by the Association are claimed to be a factor in this outcome.

The "Mileage Rule" establishes minimum distances between horse shows recognized by the Association and grants priority to established recognized shows over other shows or new shows seeking recognition for the first time. As a result, the Farm has been excluded from competing in the horse show market on a variety of allegedly desirable dates. Recognized horse shows that the Farm has been permitted to stage have allegedly been less successful economically than other horse shows recognized by the Association.

It had been assumed on the basis of prior representations that some evidence of injury would be offered by the Farm in addition to evidence of the financial success of the shows which have benefitted by the Association's mileage restrictions. However, the Farm has not substantiated its allegations relating to economic injury. Responding to an interrogatory requesting that it state the amount of revenues allegedly lost as a result of having certain of its show date applications denied, the Farm made the following statement:

As defendant is aware, plaintiff seeks leave of court to dismiss its damage claims in this action without prejudice. Accordingly, the provision of answers concerning the dollar amount of plaintiff's damages would be unduly burdensome, since the dollar amount of its damages will not lead to the discovery of admissible evidence concerning plaintiff's claims for injunctive relief.

The Farm further stated in its responses that it was "unable" to quantify the amount of damage it had sustained, that it no longer intended to compare at trial any of its shows with other horse shows, and that it did not intend to call its own expert witness at trial.

The Association has pointed to a number of facts regarding the Farm which are said to explain the Farm's inability to establish past or future financial injury. These facts are set forth below to demonstrate the unique situation presented by this particular antitrust plaintiff, whose claim is so interwoven with personal and financial relationship of its president Mrs. Swann and her husband Leonard A. Swann, Jr. ("Dr. Swann").

The Farm is a Pennsylvania corporation qualified under Chapter "S" of the Internal Revenue Code. Its profits and losses are imputed to its sole shareholder, Dr. Swann, who, as owner of the corporation, was entitled to (and did) deduct the Farm's operating losses from his personal income taxes. Dr. Swann is also the owner of the indoor arena in which horse shows conducted under the Farm's name are run, although the indoor arena is not a necessary element to the holding of a horse show. The use of the arena and the land for horse shows is presently the subject of zoning litigation. The Farm has no lease from Dr. Swann for use of the arena and has paid no rent to him.

Neither the Farm nor Dr. Swann owns the land on which horse shows conducted under the Farm's name are run. The land was purchased by Dr. Swann in 1978 and conveyed to a trustee by irrevocable deed of trust for the benefit of his daughter, Heather Swann. Pursuant to the Deed of Trust, the land on which shows are conducted may be developed at the trustee's discretion, and the Farm has his express permission to conduct its shows on trust property which, in the trustee's view, also includes the indoor arena. The Farm has not executed a lease with the trust. The trustee petitioned in January, 1985 to be relieved of his fiduciary responsibility.

The trustee on whose property the Farm shows are held has no permanent use and occupancy certificate for the indoor arena. Under the relevant zoning ordinance, a permanent use and occupancy certificate permitting the running of horse shows on the trustee's property may be issued only if horse shows are deemed entirely incidental and subordinate to the property's "farm use" zoning categorization. The trustee's application for a permanent certificate permitting use of the indoor arena for horse shows was denied in 1980 by the Zoning Officer of Easttown Township where the property is located. Although five years of litigation ensued since then, and continues today, the only record decision on the propriety of conducting horse shows on the trustee's land denied the trustee (and therefore the Farm) that right. Association-recognized horse shows may be staged at locations and facilities which their managements do not own, as the Farm has done in the past. The Farm has continued to obtain the Association's recognition of its horse shows.

Mrs. Swann testified under oath before the Eastown Township Zoning Hearing Board in the proceeding in which the trustee's zoning application was challenged because the Farm's horse shows were "commercial" activities. In her testimony supporting the trustee, Mrs. Swann explained why the farm property had been acquired. As her daughter became more involved with horse showing, she explained, "I realized that the nature was such that I really needed our own place, so we could do it with less strain, less turmoil." In addition, Mrs. Swann "thought it would be an excellent way of combining the children's interests and mine, make it sort of a social activity at the same time for myself * * * [and] to concentrate my children's main extracurricular activity in a convenient location, so I would not spend half my lifetime driving."

Both Dr. Swann's construction of the horse arena and the trustee's purchase of the trust property were financed in part by loans from Swann Oil, Inc. ("Swann Oil"), a company owned by Dr. Swann. On May 25, 1984, Swann Oil invoked the protection of the United States Bankruptcy Code and filed a petition under Chapter 11. The trustee in bankruptcy thereby possesses claims arising from the Swann Oil loans. The status of those claims awaits final disposition of the Swann Oil bankruptcy proceeding, which continues to this day. Prior to the initiation of the bankruptcy proceeding, employees of Swann Oil had carried out many of the Farm's administrative needs, including maintaining its books and records and mailing its literature to prospective exhibitors. Swann Oil no longer performs those functions.

Finally, Dr. and Mrs. Swann are presently engaged in divorce and child custody proceedings. Early in May 1984 they entered into an agreement which recited that Dr. Swann "as sole shareholder of [the Farm] is unwilling for [the Farm] to incur any further costs, expenses, attorney's fees or other liabilities in any continued participation of [the Farm] in this action." The agreement acknowledged that Mrs. Swann "has an interest in [the Farm] continuing to prosecute" this action and gave her the "exclusive right" to conduct the lawsuit, provided she (1) indemnifies the Farm and Dr. Swann from any resultant liability, and (2) distributes the net proceeds of any monies recovered to Dr. Swann first, to reimburse him for any expenses incurred by him and the Farm in any actions involving the Association.

From these facts and the proposed proof outlined in the pretrial order it is without dispute that no proof will be presented linking past or future financial damage to the operation of the mileage rule other than the bare assertion by Mrs. Swann that if the restriction of time and place with respect to horse shows for class entrants were enjoined, the Farm's shows would be more successful.

**The Farm's Lack of Standing**

While the Supreme Court has delineated a six factor test to aid the court's evaluation of whether a plaintiff has standing to sue under the antitrust laws, *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 535–43, 103 S.Ct. 897, 907–11, 74 L.Ed.2d 723 (1983), the only issue presented by the Association's motion for summary judgment is whether the Farm has presented a sufficient factual basis to establish that it has suffered any legally cognizable injury. The Farm argues that the Association's practices have and will continue unreasonably to exclude the Farm from competing in the market on favorable dates of its choosing. Due to its inability to schedule horse shows freely, the Farm claims that it is faced with "threatened loss or damage by a violation of the antitrust laws" sufficient to establish a claim for relief under § 16 of the Clayton Act. 15 U.S.C. § 26.

■ The distinction between the standing requirements for injunctive relief and treble damage recovery under the antitrust laws have been noted previously in the opinion of September 20, 1984. The standard for establishing injury sufficient to support a claim under § 16 of the Clayton Act is more liberal than the standard applied to damage claims under § 4. *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 130 (9th Cir. 1973). Section 16 provides a right of action for threatened as well as past injuries, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969); for indirect injuries, *Barr v. Dramatists Guild, Inc.*, 573 F.Supp. 555 (S.D.N.Y.1983); and in certain circumstances, for injuries which do not strictly threaten the "commercial interests" of a party. *Bratcher v. Akron Area Board of Realtors*, 381 F.2d 723, 724 (6th Cir.1967).

In the context of this case, however, the above cited extensions of the equitable standard for antitrust standing are largely irrelevant. The Farm claims that the Association's Mileage Rule causes a direct injury to its profitability, a business and commercial interest. Moreover, the actions constituting the basis for the Farm's claim extend back to 1980. In view of the longstanding nature of alleged injury and in the absence of any change in circumstances, the Farm cannot claim that it faces the threat of any greater harm than has allegedly occurred in the past. Thus, where the alleged violations "have been in existence long enough for their potential effects ... to manifest themselves, the difference in the [Section 4 and Section 16] standards is not so consequential." *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 670 n. 14 (D.C.Cir.1977). *See also Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 255 n. 2 (3d Cir.1980). Under these circumstances, therefore, it would be inappropriate to allow speculation about possible injury to the Farm. Instead, the Farm's evidence regarding its past and present injury due to the Mileage Rule will be determinative of whether it has standing to bring this antitrust action.

■ The Farm argues that it has established injury by demonstrating two essential facts: (1) that horse shows which are recognized by the Association are more desirable to exhibitors and (2) that the Association has denied the Farm recognition for certain horse shows conducted on particular dates of the year. This evidence, the Farm asserts, demonstrates that the Farm has suffered decreased profitability. To support its claim, the Farm relies heavily on the case of *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* in which plaintiff corporation was excluded from selling its products in the Canadian marketplace for a period of several years due to a

conspiracy which denied Zenith an import license.

The Farm cites the *Zenith* opinion for the proposition that the defendant's intent to exclude a competitor from a market is sufficient to establish legal injury to permit standing in an antitrust suit. While this reading finds some support in the language used by the court, it ignores the factual findings which formed the underpinnings of the Supreme Court's holding. The Court overruled the Circuit Court's dismissal of Zenith's claim, not because of any disagreement regarding the intent of defendants, but rather because the Supreme Court found adequate evidence of the effects of those actions on plaintiff's business. The Court found both that Zenith suffered a reduced market share due to the denial of an import license and that the effects of the reduced market share continued to cause reduced profitability during the period under consideration. 395 U.S. at 116–19, 89 S.Ct. at 1572–74. As the Court concluded, fact of injury is to be inferred from " 'the proof of defendants' wrongful acts and their tendency to injure plaintiff's business, *and* from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes....' " *Id.* at 123, 89 S.Ct. at 1576 (*quoting Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579–80, 90 L.Ed.2d 652 (1946)) (emphasis added).

The disparity between the extensive factual demonstration provided in the *Zenith* case and the negligible factual proof in this one indicates that the two cases do not stand on the same footing. Here, the Farm has demonstrated only that it does not intend to offer any evidence regarding the alleged injury to its profitability. The only effect from the imposition of the Mileage Rule which the Farm can demonstrate is that it was unable to schedule certain types of rated horse shows on certain dates which it had requested.

Since the Farm was given recognition for as many shows as it requested, this case does not present an instance of broad market exclusion; therefore, the fact that Association recognition confers a competitive advantage is not proximately related to the Farm's claim. Rather, the Farm must provide some evidence to indicate that the types of shows for which it sought recognition on certain dates would have been more profitable than the shows which were eventually scheduled on other dates. The facts proffered by the Farm are simply inadequate. The Farm contends in the pretrial order that the Mileage Rule restrictions forced them to hold horse shows on dates or with ratings which "it did not consider most favorable from an economically competitive standpoint." Pretrial Order at 19. Beyond this, the Farm's brief simply states that the Farm has "staged horse shows, paying their expenses, receiving their revenues, enjoying their profits, and suffering their losses." Plaintiff's Brief at 7. While the Mileage Rule apparently has caused the Farm some inconvenience, these allegations simply do not indicate that the Farm has suffered any injury redressable under the antitrust laws. *Cf. McClure v. Undersea Industries, Inc.*, 671 F.2d 1287, 1289 (11th Cir.1982) (since antitrust fact of damage cannot be based on mere speculation, directed verdict is appropriate where no evidence is proffered other than plaintiff's allegations).

Moreover, the Farm has refused to supplement its scant factual presentation with any expert testimony which would explain how the Association's practices might be expected to cause injury to a horse show operator. While such testimony might not establish standing when unsupported by sufficient facts, *Merit Motors, supra*, at 673, the lack of expert testimony in the context of the present case renders the Farm without any evidentiary support to oppose the Association's motion for summary judgment.

 The Farm need not quantify the damages sustained in order to obtain injunctive relief, *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 218 (9th Cir.1974), nor does the law of antitrust standing require that the Farm demonstrate with certainty its

profitability in a hypothetical market devoid of any restrictions imposed by the Association. *See Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931). The Farm nevertheless must set forth sufficient facts regarding its business operations to demonstrate that it has suffered some injury. Since, after the completion of extensive discovery, the Farm has not offered any evidence to demonstrate damage to its business, and since no such demonstration will be produced at trial, there exist no material issues of fact to preclude an award of summary judgment. *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Reading Industries, Inc. v. Kennecott Copper Corp.,* 631 F.2d 10, 13 n. 6 (2d Cir.1980).

**The Grant of Summary Judgment**

The trial of this action, non-jury, with over one thousand proposed exhibits, twenty-two witnesses, and deposition testimony will be expensive for the parties and time consuming for the court. As set forth above, some legal injury must be established to provide standing, even if the evidence is limited due to the absence of any experience of horse show operation without the Mileage Rule. In the absence of even a proffer of such evidence, the Association is entitled to relief by summary judgment if Rule 56 is to be given any weight. That determination obviates the necessity to resolve the Olympic exemption claimed by the Association.

Submit judgment on notice.

IT IS SO ORDERED.