NEW YORK CITIZENS COMMITTEE
ON CABLE TV, Plaintiff,

v.

MANHATTAN CABLE TV, INC., Time, Inc., American Television and Communications, Inc., Home Box Office, Inc., the City of New York, Edward Koch, Mayor, Andrew Stein, City Council President, Harrison Goldin, Comptroller, David Dinkins, Claire Shulman, Howard Golden, Ralph Lambetti and Stanley Simon, Borough Presidents, and Morris Tarshis, Director of Franchises, Defendants.

No. 86 Civ. 0859 (RWS).

United States District Court,
S.D. New York.

Dec. 18, 1986.

Robert T. Perry, Media Law Clinic, New York Law School, New York City, by Don-aldson Brown, Christopher McHattie, Brendon Newcomb, Student Interns, for plaintiff.

Cravath, Swaine & Moore, New York City, for defendants Manhattan Cable TV, Inc. American Television and Communications, Inc., Time, Inc. and Home Box Office, Inc.; Robert D. Joffe, Stephen S. Madsen, Ronald K. Chen, Alden L. Atkins, Mark A. Sirota, of counsel.

## OPINION

SWEET, District Judge.

In this action, defendants Manhattan Cable TV, Inc. ("MCTV"), Time Incorporated ("Time"), American Television & Communications Corp. ("ATC") and Home Box Office, Inc. ("HBO") (collectively, the "Time defendants") have moved to dismiss the Amended Complaint of plaintiff New York Citizens Committee on Cable TV ("the Committee") pursuant to Fed.R.Civ.P. 12(b)(6) and, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56 as to certain claims for relief under a franchise agreement dated August 18, 1970 under which MCTV provides service (the "Franchise Agreement").[1] The Amended Complaint alleges that the Time defendants have violated § 2 of the Sherman Act by monopolizing, or attempting to monopolize, the lower Manhattan market for non-sports pay television programming,[2] that the Time defendants have violated § 612 of the Cable Communications Policy Act of 1984, 47 U.S.C. § 532 (the "Cable Act") and that MCTV has breached certain provisions of the Franchise Agreement. The motion to dismiss the Cable Act claim is granted for lack of standing and the motion to dismiss

1. The Time defendants have submitted with this motion copies of the Franchise Agreement between the City of New York and Sterling Information Services, Ltd. (the "Franchise Agreement") and the 1974, 1975 and 1980 amendments to the Franchise Agreement. Manhattan Cable TV, Inc. is the successor franchisee under this Agreement.

2. By stipulation dated August 11, 1986, plaintiff dropped the City of New York and its officials (the "City defendants") as defendants in this case and has dismissed, with prejudice, its first claim for relief which had alleged conspiracies between the Time defendants and the City defendants (a) in restraint of trade in violation of § 1 of the Sherman Act and (b) to monopolize in violation of § 2. Accordingly, plaintiff's § 2 claims of actual and attempted monopolization against the Time defendants are the only antitrust claims remaining in this case.

the remaining claims is denied for the reasons set forth below.

**The Amended Complaint**

According to the Amended Complaint, the Committee is an unincorporated association of cable television subscribers residing in lower Manhattan. MCTV, a wholly-owned subsidiary of Time, provides cable television service in lower Manhattan pursuant to the Franchise Agreement, through which the City of New York authorized MCTV's predecessor in interest to construct and operate a cable television system. Although MCTV's franchise is nonexclusive, MCTV is the only company which the City has authorized to provide cable television service in that area. Defendant ATC, also a wholly-owned subsidiary of Time, is in the business of owning and operating cable television systems and is the second largest such multiple systems operator in the nation.

HBO (also a wholly-owned subsidiary of Time) produces two video programming services called "Home Box Office" (the HBO Service) and "Cinemax," which feature movies, sporting events and other forms of entertainment and information. HBO's programming services are delivered to cable systems nationwide via satellite. HBO's programming services are usually sold to cable subscribers as "pay" or "premium" services, that is, they generally are not included in the package of "basic" services provided to all subscribers for their basic subscription fee, but are provided only to subscribers who elect to take them at extra charge. In the lexicon of this litigation, HBO is a programmer.

MCTV currently offers a basic cable service package consisting of 31 channels provided as basic services and three additional pay services. Two of these pay services are the HBO Service and Cinemax, both of which are affiliated with MCTV through Time. MCTV also carries a third pay service, Sportschannel, an unaffiliated sports-oriented pay service. MCTV does not carry any other unaffiliated pay cable services such as Showtime, Bravo or the Dis-ney Channel, although its system has enough channels to permit it to do so if it wished.

According to the Amended Complaint, MCTV has refused to grant "access" to its cable system to unaffiliated pay television companies, that is, programmers other than HBO. In 1978, Showtime, a pay television service unaffiliated with Time, requested access to one of the cable channels on MCTV's system. MCTV denied Showtime's request because, as the Committee admits, insufficient channels were available. Thereafter, Showtime continued to request access to MCTV's system. In 1981, after MCTV had expanded its channel capacity, it announced that Showtime would be given access to one of the new channels, but this offer was later withdrawn. Later in 1981, MCTV granted HBO's request for access to one of MCTV's channels for its new Cinemax service. The Amended Complaint alleges further that other pay television services unaffiliated with Time have requested but been denied access to MCTV's system, although it does not indicate when these alleged "denials" of "access" occurred.

The Amended Complaint sets forth four claims for relief, of which only three remain.[3] Of these three, the first is a claim for relief under § 2 of the Sherman Act, 15 U.S.C. § 2. The Committee asserts that the Time defendants have monopolized, or attempted to monopolize, the market for pay cable movie and non-sports entertainment programming service in lower Manhattan. The Committee also asserts a claim for relief under § 612 of the Cable Act, 47 U.S.C. § 532, which requires certain cable operators to set aside a percentage of channel capacity for leased access by unaffiliated program suppliers. Finally, plaintiff asserts a pendent state claim as a third party beneficiary of certain access obligations imposed on MCTV by the Franchise Agreement with the City. The Committee seeks injunctive relief directing MCTV to make available reasonable chan-

**3.** *See supra* note 1.

nel capacity for "leased access" by unaffiliated pay cable programmers to place them on equal footing with HBO and Cinemax.

**The Present Motion**

The Time defendants have raised a number of challenges to the sufficiency of the Amended Complaint. First, they point out that the Amended Complaint states that the alleged violation is in terms of "access," while the relief sought is in terms of "leased access." Thus, they claim, the Committee seeks relief for allegedly wrongful refusals to provide leased access when the Committee does not allege that such refusals have ever occurred. Second, the Time defendants argue that the Committee's Sherman Act claims must be dismissed on the grounds of geographic and product market and state action immunity. Third, they contend that the Committee lacks standing to sue under the antitrust laws. Fourth, they maintain that the Committee lacks standing to sue under the Cable Act and, in any event, has failed to state a claim thereunder. Fifth, the Time defendants assert that the Committee lacks third party beneficiary status as a matter of law. Finally, the Time defendants urge that the First Amendment bars the relief the Committee requests.

**"Access" v. "Leased Access"**

■ When describing the conduct that gives rise to violations of law, the Amended Complaint speaks in terms of denial of "access." The claims for relief, however, request "leased access" for unaffiliated programmers. The Time defendants assert that the Committee's failure to allege that MCTV has denied "leased access" to Showtime and other unaffiliated services is fatal to its claims, since it seeks relief for allegedly wrongful refusals to provide leased access when it does not allege that such refusals have ever occurred.

According to defendants, pay programmers may obtain "access" to a cable system in a number of ways of which leasing is only one. In the vast majority of cases the major programmers enter into licensing transactions with cable operators, whereby they receive payment from the operators in return for the latter's purchase of a service which they in turn sell to subscribers. *See, e.g., American Television & Communications Corp. v. Floken, Ltd.,* 629 F.Supp. 1462 (M.D.Fla.1986). Therefore, the defendants state that the allegations respecting MCTV's denials of "access" can only be understood to refer to decisions by MCTV not to purchase exhibition rights offered to it by Showtime and others, and not to any actual request for, or denial of, leased access to MCTV's system. Furthermore, they allege that neither Showtime nor any other major pay programmer has ever sought to lease one of MCTV's channels.

Although the Committee cannot obtain equitable relief against conduct that has never occurred and is not threatened to occur, the term "access" does not necessarily exclude leased access as used in the "wherefore" clause, nor does the prayer for relief limit the Committee to the literal meaning of "leased access." It would be premature to dismiss the complaint at this point based solely on the difference in the terminology used in the body of the complaint and the prayer for relief. Therefore, the motion to dismiss on this ground is denied.

**The Sherman Act Claims**

**The Relevant Market**

The two essential elements of a claim of monopolization under § 2 of the Sherman Act are: "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business, acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). The Time defendants do not dispute that MCTV's alleged refusal to deal constitutes an unlawful "willful acquisition or maintenance" so long as MCTV has "purpose to create or maintain a monopoly," *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Nevertheless, they challenge the Committee's allega-

tions of monopoly power in a relevant market by calling into question the Committee's definition of the relevant geographic and product market. *See, e.g., Gilbuilt Homes, Inc. v. Continental Homes of New England,* 667 F.2d 209, 211 (1st Cir.1981).

■ In the first instance, any restraint on "competition" in this case must be discussed in terms of three interdependent markets: the market in which MCTV sells a package of programming to subscribers (the "retail" market), the market in which MCTV buys or leases programming from various sources (the "wholesale" market), and the market in which programmers compete for the business of subscribers by MCTV's resale to subscribers.[4] In the "retail" market, which covers lower Manhattan and the product market of all cable services, MCTV has a de facto exclusive franchise to sell to subscribers and, therefore, a lawful monopoly. In the "wholesale" market, various programmers compete nationwide to sell their programs to cable operators. The Committee has not alleged HBO to have a large percentage of the programmers' market nationwide, and no claim of monopolization is stated with respect to this market.

The market in which HBO and unaffiliated services compete for consumers' dollars is the market at issue here. These markets could be analogized to the sale of cookies to a grocer, who in turn sells them to consumers. The manufacturers of different brands of cookies compete to sell to the only grocer in town, who sells those cookies, along with other groceries, to consumers. While the manufacturers are not "retailers" as such,[5] that does not mean that the different brands of cookies on the grocer's shelf do not "compete" with each other in a legally significant sense. Cable programmers are ultimately competing for

the dollars paid by consumers, whether or not that money is paid directly to them or to the cable system, which in turn buys from the programmer. The fact that MCTV is the sole seller in the "retail" market, and sets the price for each pay cable service, does not mean that it cannot injure competition. As long as only one competitor's product is offered to consumers through the cable system, or on the grocer's shelf, that consumer may be paying a monopoly price for the product. Thus, a distinct injury to competition has been alleged, the injury to consumers resulting from the improper exclusion of all but one pay television service.

■ The relevant geographic market is defined simply as the geographic area where competition occurs. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961). The purpose of ascertaining that market is to determine the extent to which prospective competitors can enter the market and prevent alleged violators from charging monopoly prices. *See* L. Sullivan, Antitrust 41 (1974).

■ To define a market in geographic terms is to say that if prices were appreciably raised for the product within a given area, supply from other sources could not enter promptly enough to restore the old price. *Id.* In other words, a distinct market exists if sellers within the area are making price decisions protected from the need to take account of sellers outside the area. *Id.* at 68.

■ By virtue of MCTV's city-granted monopoly and alleged refusals to deal with unaffiliated programmers, HBO is fully protected in lower Manhattan from the need to take account of the price decisions of any other programmers. The alleged

---

**4.** One might also discuss this in terms of only two markets—retail and wholesale—in which the wholesale market is constrained by sale of the product to the ultimate consumer.

**5.** It is clear that programmers cannot, consistent with the Franchise Agreement, enter the market as retailers of cable-delivered services.

But that is not the same as saying that they would not compete for the consumer's dollar if they had access to the lower Manhattan market. The flow of money is indirect, but HBO and Showtime, if it had access, would clearly be "in competition" when the consumer prepared to subscribe to a pay cable service.

refusal to deal eliminates all competition between programmers for consumers' dollars in lower Manhattan, whether or not HBO and Showtime compete effectively in other markets. Within the area of the franchise, it is impossible for competing programmers, given the alleged violation, to enter the market and prevent HBO from charging noncompetitive prices to MCTV that may be indirectly passed on to consumers.[6] The very nature of the alleged violation thus defines the geographic market.

Absent an exclusive franchise and refusal to deal by MCTV, HBO would face competition in lower Manhattan from a nationwide programmers' market. Nevertheless, given MCTV's alleged violation, HBO has been effectively isolated from all competition which would force it to charge competitive prices. Thus, the franchise area, lower Manhattan, is the appropriate market.

The purpose of defining a product market is identical to that of defining a geographic market: to determine whether supply from other sources in the form of other products would enter promptly enough to hold prices down to a competitive level. *See* L. Sullivan, Antitrust 41 (1976). The court's task, therefore, is to identify those products which are reasonably interchangeable with, and may therefore compete with, the defendant's products. *See United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 395–400, 76 S.Ct. 994, 1007–09, 100 L.Ed. 1264 (1956). The product market analysis must focus on the interchangeability of the HBO Service and Cinemax with other programming. If, for instance, a small rise in HBO's prices would result in a large number of consumers abandoning their pay service subscriptions for the "basic" cable service, then the basic service would likely be in the same market.

■ The Committee alleges that the proper product market is that for pay cable television movie and non-sports entertainment services. Its further allegations that there are "myriad ... cable television pro-

gramming services" and that cable operators choose among all of these services when selecting programming to provide to customers do not make its alleged product market deficient as a matter of law. The fact that MCTV chooses among these programming services in the "wholesale" market says no more about whether those services are "reasonably interchangeable by *consumers* for the same purpose," *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956) (emphasis added), than the fact that a grocer chooses what foods to stock from a "myriad" of foods says about whether milk and bread are interchangeable to consumers. The perspective of the cable subscriber is of the utmost importance in defining the relevant product market. *See Levitch v. Columbia Broadcasting System, Inc.,* 495 F.Supp. 649, 664–65 (S.D.N.Y.1980), *aff'd,* 697 F.2d 495 (2d Cir.1983). The fact that MCTV is putting together a program from different programming services, in fact, would seem to support the conclusion that at least some of the programming services are diverse and meant for different audiences.

■ Defendants' claim that the Amended Complaint fails to allege sufficient facts as to non-interchangeability must also fail. Where the complaint specifically defines the alleged relevant product market, *see Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965), it need not go further and prove on the face of the complaint that that market is the proper one. The Committee's definition of the market as that for "pay cable television movie and non-sports entertainment services" is specific and sufficient to withstand a motion to dismiss.

### State Action Immunity

■ In addressing the applicability to private parties of "state action" immunity from the antitrust laws, the issue is wheth-

---

6. This issue is addressed in the section on standing. It must be noted here, though, that whole-

sale prices are routinely dependent on retail prices. *See infra* text at note 9.

er or not the alleged anticompetitive conduct was authorized by New York State "pursuant to state policy to displace competition with regulation or monopoly public service." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985) (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 412, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978)). To come within the immunity, the Time defendants must show that their conduct passes a two-pronged test. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy.'" *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1985) (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)). "Second, the state must supervise actively any private anticompetitive conduct." *Id.* Only the first prong of the test applies when the anticompetitive action is taken by a municipality. While it would seem that a private party acting pursuant to a franchise granted by the state should be equally immune to the antitrust laws, *see Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.*, 790 F.2d 1032, 1048 (2d Cir.1986), the private party who violates the franchise agreement by refusing access to programmers should not be protected by the same immunity.

■ The Time defendants base their "state action" immunity claims on Section 819 of Article 28 of the New York Executive Law, which delegates to municipalities the authority to award cable franchises within their municipal boundaries. It seems plain that a municipality's conduct in granting a single franchise is protected by the state action doctrine, and that the private firms which receive them are similarly protected. *See, e.g., L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517 (8th Cir.1985). Nevertheless, the authority given to municipalities to grant cable franchises, while it insulates the City's decision to grant only one cable franchise and exclude other operators as competitors, does not also protect MCTV's alleged exclusion of competitors in a market in which it acts as middlemen between competing programmers and consumers.

■ In *Town of Hallie*, 105 S.Ct. 1713, the Supreme Court held that Wisconsin statutes that grant a city authority to construct a sewage system, to "describe with reasonable particularity the district to be served," and to refuse to serve areas unannexed to the city clearly contemplate that a city may engage in anticompetitive conduct. It concluded that the Wisconsin statutes "plainly show that 'the legislature contemplated the kind of action complained of,'" *Id.* at 1719 (quoting *City of Lafayette, supra*, 435 U.S. at 415, 98 S.Ct. at 1138), that is, the refusal to supply sewage treatment to surrounding towns. There, the challenged conduct clearly fell within the statutory language. Here it does not. It can be said that the grant of such authority could "foreseeably result," *Town of Hallie*, 105 S.Ct. at 1718, in the grant of only one franchise, but not in the foreclosure of competition in the programming services. Indeed, New York City included a provision in the 1975 amendment to the Franchise Agreement requiring MCTV to provide access to affiliated and unaffiliated programmers alike on a first-come, first-served basis. See § 4(1). The Time defendants have not demonstrated that MCTV was acting pursuant to a clearly expressed state policy.

■ Even if this court were to find that refusals to deal with unaffiliated pay programmers were the foreseeable result of N.Y.Exec.Law § 819, the defendants have not met the other prong of the test: active state supervision. Because MCTV has allegedly acted outside of the Franchise Agreement, it cannot be said that it should be subject to the easier test applied to municipalities. The rationale behind providing a more lenient test for municipalities is that a municipality may be presumed, absent a showing to the contrary, to act in the public interest. *City of Hallie, supra,* 105 S.Ct. at 1720. In contrast, a private

party that is violating a franchise agreement with the municipality may be presumed to be acting primarily on its own behalf. *See id.* Because it is by hypothesis violating the agreement, "there is a real danger that [it] is acting to further [its] own interests, rather than the governmental interests of the state." *Id.* at 1720; *see also id.* at 1720, n. 10 ("where ... municipal regulation of a private party is involved ... active state supervision must be shown") (citing *Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 85 L.Ed.2d 36, 105 S.Ct. 1721 (1985)). Since the complaint makes no mention of active state supervision, defendants must fail on the motion to dismiss.

### Standing

To have standing to seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, a private plaintiff must be able to show "threatened loss or damage by a violation of the antitrust laws." While it is possible that a plaintiff may have standing to sue for injunctive relief under § 16, yet lack standing to sue for treble damages under § 4, *see, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969), a plaintiff must still allege an " 'antitrust injury' " to qualify for injunctive relief. *Cargill, Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, ——, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (U.S.1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)).

The purpose of the antitrust laws is to promote competition, and the purpose of a right of action under those laws is to provide redress for those who are or will be harmed by the effects of injury to competition. Thus, the injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possi-

ble by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

The Committee alleges three types of injuries resulting from MCTV's alleged refusals to deal with unaffiliated pay programmers: diminution of choice in pay cable television services, diminution of the quality of pay services, and higher prices for pay television services. While diminution in consumer choices alone may not confer antitrust standing, *see Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286, 1293 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974), both lack of choice and diminution in quality have been seen as manifestations of injury to competition. *See Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Standard Oil Co. v. United States,* 221 U.S. 1, 52, 31 S.Ct. 502, 512, 55 L.Ed. 619 (1911). It is not necessary to decide, however, whether these allegations alone would be sufficient allegations of antitrust injury, since the Committee's allegation that subscribers pay higher prices is the kind of injury contemplated by the antitrust laws.

In *Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court identified five factors, beyond the existence of a causal relationship between the defendant's conduct and the harm alleged, which must be considered in determining whether a plaintiff has antitrust standing:[7] 1) the nature of the plaintiff's injury, 2) the directness of the asserted injury, 3) the court's interest in keeping the scope of complex antitrust trials within judicially manageable limits, 4) the existence of other persons more directly injured who can seek to redress the alleged violation, and 5) the

---

7. Although *Associated General* addressed standing under section 4 of the Clayton Act, most of the factors it delineated apply equally in actions for injunctive relief. *See Ashley Meadows Farm, Inc. v. American Horse Shows Association,* 617 F.Supp. 1058, 1063 (S.D.N.Y.1985); *cf. Cargill,* *Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, —— n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (U.S.1986) ("certain considerations relevant to a determination of standing under § 4 are not relevant under § 16").

speculativeness of the injury. *See id.* at 537–45, 103 S.Ct. at 908–12.

■ The key issue here is whether the Committee's allegation that subscribers must pay higher prices, without any additional facts, is sufficient to allege an antitrust injury to plaintiff as a representative of *consumers.*[8] Consumers have standing when they are injured as a result of a defendant's improper exclusion of competitors from the market. *See Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In *McCready,* however, the plaintiff had a proven economic injury: money paid to a psychologist that the defendant unlawfully refused to reimburse. In this case, economic injury to consumers may result from the exclusion of unaffiliated pay cable services from the market. Basic economics dictates that the existence of only one seller in a given market would lead to higher prices charged to the buyer in that market.

Although the middleman in this sale has a lawful monopoly in pay services and thus may already charge prices higher than it would if other operators were competing in the "retail" market, it is not established as a matter of law that higher prices charged by pay services programmers do not lead to higher prices paid by subscribers.[9] Indeed, although the operator typically sets the retail price for the programming service, the sum it pays to the programmer often reflects a set amount per subscriber plus a percentage of the amount by which the operator's retail rate exceeds a given sum. *See American Television & Communications Corp. v. Floken, Ltd.,* 629 F.Supp. 1462, 1464–65 (M.D.Fla.1986). Thus, the "wholesale" prices charged to MCTV and the "retail" prices to consumers are not independent. The Committee should be given the opportunity to show that its members have suffered injury from higher prices.[10]

■ Application of the *Associated General* factors demonstrates that the Committee has standing to raise its antitrust claims. The nature of the injury is precisely that which Congress intended to remedy:

As the legislative history shows, the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market.

*Associated General,* 459 U.S. at 538, 103 S.Ct. at 908. MCTV's actions are alleged to have precluded competition between programmers, the immediate result of which was higher prices to consumers. A price increase resulting from the diminution of competitive market forces "is assuredly one type of injury for which [§ 16] potentially offers redress." *McCready, supra,* 457 U.S. at 482–83, 102 S.Ct. at 2550. The fact that the plaintiff is not a participant in the programmers-operators market does not deny it standing, where an impact on prices paid by the ultimate consumer is clearly foreseeable. *See Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1498–99 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986) (plaintiff's injury as a consumer in the bank-mortgages market was both a foreseeable and necessary step in furthering the anticompetitive conspiracy in the bank-law firm title services market). Unlike the situation in *Associated General,* where the Union's goals of enhancing earnings and improving the working conditions

---

**8.** This court is not bound by plaintiff's conclusory allegations of harm, *see, e.g., SCM Corp. v. Radio Corp. of America,* 407 F.2d 166, 169–70 (2d Cir.), *cert. denied,* 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969), and must consider whether plaintiff has pleaded any facts to support its contention. *Cf. Warth v. Seldin,* 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975).

**9.** The fact that the Committee's real complaint in this action seems to be the lack of a wider selection in pay services does not change this conclusion.

**10.** If, for instance, it can be shown that subscribers' prices for television are lower in areas in which Showtime and HBO are both available, plaintiff may be able to make out a prima facie case of injury.

of its membership were not necessarily served by uninhibited competition among employers, *see Associated General,* 459 U.S. at 539, 103 S.Ct. at 909, here a decrease in prices charged by programmers, if passed along by MCTV to subscribers, would certainly serve the Committee's interest.

As discussed above, the Committee's alleged injury is not the direct and immediate result of lack of competition between programmers, since any price cut would have to be passed along to subscribers through MCTV.[11] Nevertheless, the alleged link between injury to unaffiliated programmers and injury to the ultimate consumers does not involve mere speculation as in *Associated General.* Logic dictates that lower prices in the "wholesale" market are likely to result in lower prices to consumers, even where the "retail" seller has a monopoly over the "retail" market. While MCTV would seem to remain free to charge the same price for unaffiliated pay services that it presently charges for the HBO service,[12] the presence of an unaffiliated party could well change the market dynamics in a system now closed to outside competition. The Time defendants would be faced with a decrease in profits resulting from a competing programmer's entry into the market; in such circumstances, it is rational to infer that competition for ultimate consumers would be likely to result.

On the other hand, another class of identifiable potential plaintiffs—the excluded pay television programmers—could directly challenge the alleged antitrust violations. *See Associated General,* 459 U.S. at 541–42, 103 S.Ct. at 910. The existence of this class diminishes the justification for allowing the Committee to perform the office of a private attorney general. *See id.* at 542, 103 S.Ct. at 910. As the Supreme Court noted:

Indeed, if there is substance to the [plaintiff's] claim, it is difficult to unders'.and why these direct victims of the conspiracy have not asserted any claim in their own right. The [plaintiff's] suggested explanations of this fact tend to shed doubt on the proposition that these "victims" were actually harmed at all.

*Id.* at 542 n. 47, 103 S.Ct. at 910.

However, this factor alone should not deny the Committee standing, if it is able to demonstrate direct harm resulting from the Time defendants' refusal to deal. Importantly, the Supreme Court has recently suggested that the existence of parties who have been more directly harmed is not relevant to an action for injunctive relief, because it is relevant only to protecting against multiple lawsuits and multiple recoveries. *See Cargill, supra,* —— U.S. at —— n. 6, 107 S.Ct. at 490 n. 6. It may be relevant here, since different plaintiffs might request different relief in multiple lawsuits. Nevertheless, the Committee has suggested plausible explanations for the programmers' silence. Since ATC owns and operates many cable television systems in the United States, the programmers may fear retaliation were they to assert antitrust claims against the Time defendant. It is also possible that these programmers too are affiliated with cable systems in other markets, in which similar practices may occur to their advantage. Here, since the Committee represents the ultimate consumers of the excluded product, who have perhaps the most to lose from higher prices, it is not necessary to wait for the programmers to bring suit. The advantages of competition are ultimately to the benefit of the consumer, who should be able to bring such a suit to vindicate the purposes of the antitrust laws.

11. An increase in competition by improving quality rather than prices would be automatically passed on to subscribers, since MCTV apparently does not alter the programming it buys.

12. There are limits on how much MCTV can charge subscribers for its pay cable services, even if it holds a state-granted monopoly on cable operations. For instance, if its refusal to deal with unaffiliated programmers is found to be a violation of the antitrust laws, then a decision to buy a service such as Showtime but charge a price so high that no consumer would subscribe to it would constitute a *de facto* refusal to deal.

## Cable Act Claims

■ In its Amended Complaint, the Committee asserts a claim for relief under § 612 of the Cable Act, which requires cable operators having 36 or more activated channels to designate certain channels for access on reasonable terms to persons unaffiliated with the cable operator. 47 U.S.C. § 532. In particular, the Committee alleges that Time, ATC and MCTV have violated § 612 by denying leased access to unaffiliated pay cable program suppliers such as Showtime, Bravo and The Disney Channel.

Section 612(d) of the Cable Act provides that:

Any person aggrieved by the failure or refusal of a cable operator to make channel capacity available for use pursuant to this section may bring an action in the district court of the United States for the judicial district in which the cable system is located to compel that such capacity be made available. If the court finds that the channel capacity sought by such person has not been made available in accordance with this section, or finds that the price, terms, or conditions established by the cable operator are unreasonable, the court may order such system to make available to such person the channel capacity sought, and further determine the appropriate price, terms, or conditions for such use consistent with subsection (c) of this section, and may award actual damages if it deems such relief appropriate. . . .

47 U.S.C. § 532(d).

The Committee asserts that it is an "aggrieved party" within the meaning of the first sentence of § 612(d) because its members have been denied the diversity of pay television sources that was the underlying goal of the leased access requirements in § 612 of the Cable Act. See § 612(a), 47 U.S.C. § 532(a).

Indeed, the Committee's members are clearly the intended beneficiaries of these provisions of the Cable Act. Section 612 explicitly includes the Committee's members when it states:

The purpose of this section is to assure that the widest possible diversity of information sources are made available to the public from cable systems in a manner consistent with growth and development of cable systems.

47 U.S.C. § 532(a).

Nevertheless, § 612(d), read in its entirety, does not support the conclusion that the Committee has standing to bring this claim. Although the first sentence of § 612(d) provides that "any person aggrieved" by a cable operator's failure to make channel capacity available may sue in federal court, the second sentence of the subsection makes plain that the term "person aggrieved" refers only to cable programmers aggrieved by a denial of leased access. The second sentence provides that if "the channel capacity sought by such person" was wrongfully withheld, then the court may order the offending operator to "make available to such person the channel capacity sought." Further, the provision empowers the court to set the "price, terms or conditions" of the lease. Thus, on its face, the statute shows that the "aggrieved persons" for whom it creates a cause of action are those who have sought leased channel capacity pursuant to § 612 and been refused. See 1 Ferris & Lloyd, *Cable Television Law* ¶ 3.06, at 18 (Spec.Supp.1985). ("Section 612 gives *potential leased access users denied access* a statutory cause of action") (emphasis added).

The legislative history confirms the plain meaning of the statute. See H.R.Rep. No. 98–934, 98th Cong., 2d Sess. 52–53 ("House Report"), *reprinted in* [1984] U.S.Code Cong. & Ad.News 4655, 4689–90. The House Report expresses concern that delays associated with litigation under § 612(d) could "undermine the financial viability of programming services" denied leased access and expresses the hope that courts will manage such suits so as "to minimize any adverse impact *on programmers.*" *Id.* at 52, *reprinted in* [1984] U.S. Code, Cong. & Ad.News 4689 (emphasis added). Similarly, it notes that the court may set the terms of a lease in an action

under § 612(d) if the "cable operator has made channel capacity available to the party bringing the action" on unreasonable terms. *Id.* at 53, *reprinted in* [1984] U.S. Code Cong. & Ad.News 4690.

The use of the broad word "person" in the first sentence of § 612(d), rather than a defined term such as "programmers," does not indicate a legislative intent to permit broad standing. There is no defined term in the Act for programmers as such. In any event, Congress would have an understandable reason not to use such a term since, as the other provisions of § 612 make plain, *any person* may seek to lease channel capacity, whether or not that person is a "programmer." This broad extension of the right to lease a channel is consistent with the statutory purpose of providing a diversity of cable programming sources. Thus, Congress' use of the language "any person aggrieved" in § 612(d) merely reflects the fact that under § 612 generally any person may be a programmer; it does not indicate that any person may sue whether or not a programmer.

*American Television & Communications Corp. v. Floken, Ltd.*, 629 F.Supp. 1462 (M.D.Fla.1986), does not dictate a contrary conclusion. *Floken,* which interpreted § 705 of the Cable Act, 47 U.S.C. § 605 (Supp. II 1984), rather than § 612, held that a plaintiff cable operator had standing to sue as "any person aggrieved by the violation" under § 705(d)(3)(A), even though the operator's status did not "fall within the literal language" of the regulatory provisions of § 705, 47 U.S.C. § 605(a). *Floken,* 629 F.Supp. at 1470.[13]

While § 605(d)(3)(A) permits "any person aggrieved" to sue, without further limitation, § 612 in contrast contains additional language which on its face does not include the Committee and its members even though they would seem to be within the statutory "zone of interests." Further-

more, the complex remedy provided by § 612(d) militates against allowing plaintiffs who have not been denied access to sue. Section 612 requires the court not only to order that a lease be given if one has wrongfully been denied, but also to regulate important aspects of the parties' dealings, including the rates, terms and conditions for a particular lessor. *See* 47 U.S.C. § 532(d); *see also id.* §§ 532(c)(1), 532(f). While in this case a complex ratemaking proceeding may be avoided by ordering MCTV to provide access on the same terms and conditions as HBO, it is apparent that more difficult ratemaking issues could arise in most actions under § 612(d). For instance, the Act permits an operator to establish its own rates, terms and conditions for a given lessor, and to discriminate among lessors, based on the effect of a particular programmer's activities upon such factors as the "operations, financial position, and market development" of the operator's system. *Id.* § 532(c)(1). The Committee has no interest in establishing a particular lease rate.

In some cases a right of action may be implied when Congressional intent may be discerned from "the legislative history and purposes of the statute, the identity of the class for whose particular benefit the statute was passed, the existence of express statutory remedies adequate to serve the legislative purpose, and the traditional role of the states in affording the relief claimed." *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 536, 104 S.Ct. 831, 838, 78 L.Ed.2d 645 (1984). In this case, however, the existence of an express right of action in § 612 for persons other than plaintiff weighs strongly against the courts creating an implied right of action under the same provision for this plaintiff. The Supreme Court has cautioned that "where a statute expressly provides a particular remedy or remedies, a court may be chary

---

**13.** As the *Floken* court noted, the cable operator was outside the "literal language" of the regulatory provisions only in the limited sense that it was not itself a transmitter of any signal over the airwaves and did not itself have power to authorize others to receive the signal. *See* 629 F.Supp. at 1469. It was, however, quite clearly within the contemplated scope of the provisions, which generally protect the integrity of communications over the airwaves. *See* 47 U.S.C. § 605(a).

of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). The explicit language of § 612(d), which indicates that Congress did not envision consumers bringing suit under § 612, and the difficulties with ratemaking without the programmer as a party lead this court to conclude that this is not an appropriate case for implying a right of action. Although the Committee argues that pay cable program suppliers are unwilling to come forth, they would seem in the case of ratemaking to be almost necessary parties.

Therefore, the Committee lacks standing, either under the express right of action in § 612(d) or under an implied right of action, to bring this action under § 612 of the Cable Act. The Committee's Third Claim is therefore dismissed. In light of this disposition, it is unnecessary to address the Time defendants' claim that plaintiff has failed to state a claim for relief under § 612.

**Third-Party Beneficiary Claim**

▇ In its Fourth Claim for relief, the Committee has asserted a third party beneficiary claim against the Time defendants under § 4(f) [14] and § 4(1) [15] of the City's franchise agreement with MCTV, based on MCTV's alleged breach of its obligations under those provisions to make channel

14. Section 4(f) provides that:
   Priority on Additional Channels shall be given to the use of the System's transmission capability by persons other than the Company, its subsidiaries and affiliates, to provide auxiliary communications services of kinds different from those provided over the other types of Channels specified herein. There shall be open, non-discriminatory access to such Channels within the limits of available capacity. .... If at any time after five years from the effective date of this contract the Board determines, following a public hearing on notice, that rendition of any auxiliary service by the Company or a subsidiary or affiliate has tended to create a monopoly or to restrain trade, the Board may issue such direction relating thereto as it deems appropriate to protect the public interest, including an order to discontinue one or more particular services or to divest any financial interest in the entity operating such service or services within a reasonable time.

15. Section 4(1) provides that:

capacity available to unaffiliated pay cable programmers. The Time defendants have moved to dismiss this claim or, in the alternative, for summary judgment. [16]

Although government contracts generally benefit the public, members of the public are not thereby converted into third party beneficiaries of such contracts entitled, without more, to sue for an alleged breach. "While in a broad sense every city contract, not improvident or wasteful, is for the benefit of the public, more than this must be shown to give a right of action to a member of the public nor formally a party." 22 N.Y.Jur.2d Contracts § 280 at 144 (1982). The Second Restatement of Contracts states that "[g]overnment contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." Restatement (Second) of Contracts § 313 comment a (1981).

The New York Court of Appeals has recently adopted the Restatement formulation of the third party beneficiary doctrine. In *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 495 N.Y. S.2d 1, 485 N.E.2d 208 (1985), the Court of Appeals described the general test for determining third party beneficiary status as follows:

> The Company shall make available its Pay Television channels to all persons on a first-come, first-served basis at nondiscriminatory rates and terms to the same class of user irrespective of whether such users are subsidiaries or affiliates of the Company.... In the event the Company offers billing, audience promotion, or any other services, including but not limited to the installation or rental of equipment, to any channel user offering Pay Television, including subsidiaries or affiliates of the Company, or in the event that the Company itself uses any such services, then the Company shall make available identical services to other persons desiring to use channels at non-discriminatory rates and terms to the same class of user. All rates charged by the Company, its subsidiaries, affiliates or other users to subscribers of Pay Television shall be on a non-discriminatory basis to the same class of subscriber.

16. *See supra* note 1.

Essential to status as an intended beneficiary ... is either that "performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or that "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

66 N.Y.2d at 44, 495 N.Y.S.2d at 5, 485 N.E.2d at 212 (quoting § 301(1) of the Restatement) (footnote omitted). The Court of Appeals further held that "the same rules apply to contracts with a government or governmental agency except to the extent that application would contravene the policy of the law authorizing the contract or prescribing remedies for its breach." *Id.* (citing § 313(1) of the Restatement).

The New York Court of Appeals has noted that in its decisions upholding a third party's right to enforce contracts, it is either the case that no one other than the third party can recover in the case of breach, or that the language of the contract clearly evidences an intent to permit enforcement by the third party, as by fixing a rate at which the third party can obtain goods or services. *Fourth Ocean Putnam*, 66 N.Y.2d at 45, 495 N.Y.S.2d at 5, 485 N.E.2d at 212. The first line of cases is inapposite here, since money damages are not in issue. Therefore, to find that the Committee has standing to sue under these provisions of the Franchise Agreement, this court must find that the language of the contract clearly evidences an intent to permit suit by the third party.[17]

The Franchise Agreement as a whole clearly manifests an intent to benefit the Committee's members in their status as cable subscribers in lower Manhattan. The agreement requires the cable operator to install a cable system, provide various services to anyone who reasonably requests them, maintain the system and respond to subscribers' service calls promptly, and charge rates not greater than a given maximum. The specific provisions of the Franchise Agreement relied on in the Amended Complaint also evidence an intent to benefit subscribers. The provisions of Section 4(f) require MCTV to give nonaffiliates priority of access over affiliates when demand exceeds available capacity. Although the priority of access provision does not on its face benefit subscribers by either guaranteeing diversity or more choice, it does guarantee that if there are limited additional channels, nonaffiliates will not be forced out. It is probable that the City made a reasoned judgment that nonaffiliates will create services of more benefit to subscribers or at lower prices than those produced by affiliates. The provision allowing the City to commence a proceeding before the Board of Estimate to determine whether "rendition of any anxiliary service by the [franchisee] or ... an affiliate has tended to create a monopoly or restrain trade" does not preclude suit by subscribers. The establishment of a special administrative remedy for the City when provision of service by an affiliate has tended to create a monopoly does not address the violation alleged here—denying *priority* to nonaffiliates. In fact, the establishment of a special remedy in that specific circumstance tends to show that the City envisioned other remedies for such violations as are alleged here.

Similarly, section 4(1), as amended in 1975, requires MCTV to make available its pay television channels on a "first-come, first-served basis on non-discriminatory rates and terms" to affiliates and nonaffiliates alike. Again, this provision presup-

---

17. The Committee asks the court to apply more liberal standards when the third party beneficiary claimant seeks purely injunctive relief rather than damages. While it is true that courts have been concerned that a finding of liability would impose a "crushing burden" on government and those with whom it contracts, *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 165, 159 N.E. 896, 897–98 (1928), a concern absent here, plaintiff cites no authority in support of this proposition. In fact, the New York courts apply identical standards to injunctive and damages actions. *E.g., Associated Flour Haulers & Warehousemen, Inc. v. Hoffman*, 282 N.Y. 173, 26 N.E.2d 7 (1940); *Airco Alloys Division, Airco, Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 430 N.Y.S.2d 179 (4th Dep't 1980); *Westhampton House, Inc. v. Carey*, 506 F.Supp. 215 (E.D.N.Y.1980).

poses a certain number of channels and seeks to permit access to non-affiliates as well as affiliates. While it does not provide a benefit to subscribers in the form of better service or diversity or increase in choice, it confers a benefit on subscribers by insuring that they will have access to unaffiliated service providers who may provide better programming or lower prices.

A plaintiff who can show a special benefit to himself in contrast to any benefit he enjoys as a member of the public generally may be an intended beneficiary of a government contract, *see, e.g., Kornblut v. Chevron Oil Co.*, 62 A.D.2d 831, 407 N.Y. S.2d 498 (2d Dep't 1978), *aff'd*, 48 N.Y.2d 853, 424 N.Y.S.2d 429, 400 N.E.2d 368 (1979); *International Railway Co. v. Rann*, 224 N.Y. 83, 120 N.E. 153 (1918); *Town of Ogden v. Earl R. Howarth & Sons, Inc.*, 58 Misc.2d 213, 294 N.Y.S.2d 430 (Sup.Ct.Monroe Co. 1968). In this case there are two such groups: the unaffiliated programmers denied access and the cable subscribers who would directly benefit from that access. Subscribers are not so much "members of the public" as identifiable classes. Water, The Property in the Promise: A Study of the Third Party Beneficiary Rule, 98 Harv.L.Rev. 1109, 1204 (1985). The provisions at issue here can be analogized to those provisions directly setting rates, since the claim here is that permitting access to unaffiliated programmers will serve to lower the rates and raise the quality of programming.

Furthermore, the Franchise Agreement contemplates third party actions brought against MCTV. In particular, Section 23(g) of the Franchise Agreement provides:

> The City hereby reserves to itself, and the Company hereby grants to the City the right to intervene in any suit, action or proceeding involving any provision in this contract.

This suit brought by subscribers is such an action.

Therefore, the Time defendants' motion for summary judgment on the third party beneficiary claim is denied.

**The First Amendment Defense**

The final ground on which the Time defendants seek dismissal of the Amended Complaint is that the injunctive relief sought by plaintiff—an order directing MCTV to make leased access channels available on reasonable price, terms and conditions to unaffiliated pay television services—is barred by the First Amendment. In particular, the Time defendants assert that the First Amendment proscribes governmental interference in the editorial judgment concerning the nature and "mix" of programming that a cable television operator provides to its subscribers.[18]

It must be noted that at this stage in the proceedings such a claim seems premature. The government conduct challenged by the Time defendants is not a regulation or law, but an injunction that may be issued when and if the defendants are found to have violated the antitrust laws. If such an injunction is issued, this court with its equitable powers can fashion any manner of injunctive relief. The Time defendants, therefore, challenge any governmental encroachment, no matter how narrowly drawn, on the editorial discretion of cable operators.

Their position thus stated, the Time defendants rely solely on the importance of editorial discretion, arguing that none of the grounds set forth in the Amended Complaint can justify "such a complete and potentially permanent interference with MCTV's editorial discretion," as the usurpation of an entire channel, or even more, of MCTV's limited number of channels.

It is a given that differences among the various modes of communication justify differences in the First Amendment standards applied to them. *Quincy Cable TV, Inc. v. F.C.C.*, 768 F.2d 1434, 1448 (D.C.Cir. 1985) (citing *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 386, 89 S.Ct. 1794,

---

**18.** In light of the disposition of the Cable Act claim, *supra*, this court need not consider the constitutionality of § 612 of the Cable Act.

1804, 23 L.Ed.2d 371 (1969)), *cert. denied,* — U.S. ——, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986). While the traditional press has been accorded a high level of First Amendment protection, *see Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the broadcasting media has been subject to far more intrusive regulation because of "inescapable physical limitations" on the number of voices that can be carried over the air. *Quincy,* 768 F.2d at 1448; *see Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). In *Red Lion Broadcasting,* the Supreme Court upheld against a First Amendment challenge FCC regulations requiring that radio and television broadcast stations present public issues and that each side of those issues be given fair coverage.

■■■ Because this issue is raised on a motion to dismiss the complaint, no evidence of attributes of cable television have been presented relative to a standard of review analogous to that of either the broadcast media or newspapers. Although the parties in their memoranda of law have addressed the characteristics of the cable media, those statements cannot properly be used by the court. While the allegations in the complaint must be taken as true, they do not thoroughly address this point. Without more facts about cable television, it may be premature for this court to decide which standard of review should apply. *See City of Los Angeles v. Preferred Communications, Inc.,* —— U.S. ——, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986).

One court has applied a stricter standard of review to the cable television medium. On appeal of a denial of a petition to the FCC, the Court of Appeals for the District of Columbia Circuit, on the record before it, concluded that cable television shares attributes of the more traditional press and therefore applied a largely print-media-oriented First Amendment analysis. *See Quincy, supra,* 768 F.2d 1434. Under that standard, the Court first addressed whether the challenged regulation was an "incidental" burden on speech, evidencing a

governmental interest unrelated to the suppression or protection of a particular set of ideas, or was "intended to curtail expression—either directly by banning speech because of … its communicative or persuasive effect on its intended audience … or indirectly by favoring certain classes of speakers over others." *Quincy,* 768 F.2d at 1450 (quoting *Home Box Office, Inc. v. F.C.C.,* 567 F.2d 9, 47–48 (D.C.Cir.) (per curiam), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)). If the regulation is "incidental," it will be sustained if " 'it furthers an important or substantial governmental interest … and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " *Quincy,* 768 F.2d at 1451 (quoting *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968)). If the regulation is not a mere incidental restriction on expression, the government bears a significantly heavier burden of justification. *Quincy,* 768 F.2d at 1451.

Should this court choose to follow the stricter standards set down in *Quincy,* dismissal of the complaint is, nevertheless, inappropriate at this time. An injunction compelling MCTV to offer programming which it has elected not to carry in the interest of furthering competition between programmers is "unrelated to the suppression of free expression." *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. Such an injunction is not "intended to curtail expression—either directly by banning speech because of a harm thought to stem from its communicative or persuasive effect on its intended audience, … or indirectly by favoring certain classes of speakers over others." *Home Box Office, supra,* 567 F.2d at 47–48. The narrow purpose of an injunction here would be to allow competition in the programmers' market, an injunction neutral on its face to different speakers and speech, providing only that there is more than one speaker. Since the complaint alleges that channels are now available, that additional channels could easily be provided, and does not designate a particular programmer to be provided access,

an injunction not to discriminate would not favor any class of speakers over another. Affiliated and unaffiliated programmers would be treated the same.

Unlike the situation in *Quincy*, the programmers and operators here may have competing First Amendment interests. While an injunction here would work "substantial limitations ... on the operator's otherwise broad discretion to select the programming it offers its subscribers," *Quincy*, 768 F.2d at 1457, it would at the same time assuage the danger that "cable programmers are shut out entirely from the only forum capable of conveying their programming," *id.* at 1451–52. Despite the intrusion on an operator's discretion, however, other factors recognized as of the greatest importance counsel the court to apply the standard of review reserved for incidental burdens on speech. A nondiscriminatory injunction, for instance, would neither "favor one group of speakers over another," *id.* at 1453, nor regulate the content of speech. More importantly, an injunction would enable programmers to reach their intended audience, a result consistent with the preference of plaintiff cable subscribers. *Id.* The Supreme Court has repeatedly admonished that the "interests of viewers should be considered 'paramount' in the First Amendment calculus." *Id.* (quoting *Red Lion Broadcasting, supra*, 395 U.S. at 390, 89 S.Ct. at 1806).

Assuming that the proposed injunctive relief would constitute an "incidental" burden on speech, it will withstand challenge if " 'it furthers an important or substantial government interest ... and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " *Quincy*, 768 F.2d at 1451. In the abstract, it is difficult to conclude that this standard has not been met. The purpose of the antitrust laws, to encourage competition for the ultimate benefit of consumers, would appear to be a substantial government interest.

Whether it is sufficiently weighty to warrant interference with First Amendment rights in this case must await determination of the substantiality of any interference in view of MCTV's de facto monopoly of cable services, the actual availability of cable channels, and alternatives to the requested injunctive relief. Similarly, whether the restriction imposed is essential depends on any relief that is fashioned in response to any antitrust violation. Since this court can fashion an injunction "no greater than is essential to the furtherance of that interest," a challenge to injunctive relief is inappropriate at this time.

Therefore, the Time defendants' motion to dismiss the complaint on First Amendment grounds, under the antitrust laws and under third party beneficiary doctrine is denied. The motion to dismiss the Third Claim is granted.[19]

IT IS SO ORDERED.

**19.** The Committee has withdrawn the first claim by stipulation dated August 11, 1986. *See supra* note 2.